Good morning, your honors. May it please the court. My name is Tracy Olson, and along with my co-counsel Brett Johnson, we're here on behalf of intervener Yuma County Republican Committee. Let me confirm, counsel, you agreed to split time. Is it 13-7? That's correct. All right. And our split will largely reflect the briefings and mirror the issues we brought in our briefings. Are you reserving time for rebuttal? Yes, your honor. I'd like to reserve three of my 13 minutes. This case is about two common-sense election laws and interpreting the plain language of those laws in the correct context. Instead of ceding to the well-accepted principle that context is the primary determinant of a word's plain meaning, plaintiffs would like this court to read the cancellation and felony provisions in a silo, simply because reading these statutes in complete isolation is the only way to reach their limitless interpretations. Doing so, however, will render statutory language meaningless or lead to absurd interpretations. Diving straight into the cancellation provision, I want to start by emphasizing two of the district court's legal errors. The first is the district court's reasoning that the cancellation provision applies to out-of-state county recorders. And there are two statutory indications that cut against that reasoning. The first is that the reference to county recorders within 16165 and within Arizona law generally refers to county recorders in Arizona. It refers to their duties to update the statewide voter database. It refers to their duties to cancel voter registrations and other administrative duties. It would be absurd reasoning to accept more than that to out-of-state county recorders. Also, ARS 16-165 distinguishes between county recorders or counties and out-of-state registrations. I'd like to direct you to ARS 16-165A9, where that provision states that the person is a resident of the county and is not knowingly registered to vote in another county or another state. There, the statute distinguishes between the references between counties and the references between other states. And so I think that's indicative of the difference between and should be extended here to understand. If we reject your reading and your distinguishing of interstate versus intrastate, would we be creating a circuit split with the Seventh Circuit on the cancellation provision? No, Your Honor, I don't think you would be. There's two reasons for that. The first is in the Sullivan case, they talk about the difference between passing a voter's authorization along and they specifically say, we see nothing in the NVRA that would prohibit the method of passing along a voter's authorization to Indiana, an authorization of cancellation form that a voter personally signs and then is forwarded to Indiana from another state in compliance with the NVRA. And so if we look at that provision in compliance with what we have with the cancellation provision, I think we can read them in harmony. The second reason is the guidance we've seen from the Arizona Secretary of State in the Election Procedures Manual, specifically on page 35 of the Election Procedures Manual. The Secretary of State gives some guidance regarding what would happen if they received information from an out-of-state county. And in that sense, they do look to get direct confirmation from the voters. There is no violation of the NVRA. Is this the 2019 guidance that you're talking about? That's correct. The second error that I wanted to emphasize here for the Court today is the District Court's provision as applying, or excuse me, is their conclusion that the information from one county recorder can't be imputed to another county recorder. And I think that provision from Sullivan that we just discussed is indicative here. It talks about the idea that it doesn't matter whether or not the voter communicated directly with that specific election official that's canceling the registration. It talks about the important fact is that the voter generated the documentation. And that's what we have here. And also... Can you address the timing issue with the cancellation provision? So, for example, say there's a voter who lives in Tucson and then decides to move, it's too hot, I'm going to move to Phoenix where it's, you know, one degree less hot, and register to vote in Phoenix. And then the county voting registrar in Phoenix realizes, learns that this voter has been in Tucson. Presumably that person should, the registration that should be canceled is in Tucson, but just on the plain language of the statute, it seems to allow the registrar in Phoenix to cancel that person's voting registration. And then that person would have no place to vote. I mean, is there anything that will prevent county registrars from doing that? Yes, Your Honor. I think you have to look at the cancellation provision is housed within 16-165 and look at that within the greater statutory scheme. ARS 16-164 and ARS 16-166, which implement the cancellation process, specifically 16-166 talks about what happens when the county recorder receives a new registration form. And ARS 16-664 talks about what happens when, how they cancel it and how they electronically notate that cancellation. In both of those neighboring provisions, they talk about the new registration. And the new registration, meaning the more recent in time, is the one that becomes the operative registration. That's what becomes the official public record that is governing in the AVID statewide voter database. Do you know what happens logistically if someone moves within the 30 days before an election? Because there was some reference that even though they re-registered a new place, they'll vote at the old one. So, does the voter list maintain the effectiveness of the old one until, you know, past the election and then cancels it? Or do you know logistically exactly what happens? Or are there two registrations simultaneously? What is? Your Honor, my understanding of that statute, the one that you referred to where 29 days before the election, the voter's registration remains at their prior residence. So, if you move within those 30 days before the election, you're registered to vote at your prior residence. And so, my understanding of how that's implemented is there's a temporary freeze on that registration and then it's updated as of the day after the election. Essentially delay the change of address, the change of registration to the new address until after the election occurs in that scenario. Correct. But they couldn't choose to vote at the new location? No. Well, excuse me. They could choose to vote at the new location, but they would be voting provisionally. And their registration would be at the old location. So, they'd have an opportunity to, but it wouldn't be a valid registration location. But if the new location was in a different county and congressional district, say, where would their ballot be cast? That voter's ballot should be cast where the residence was 30 days prior to the election. Before your time runs out, do you want to talk about the felony provision? Yes, Your Honor. On the felony provisions, I just want to emphasize the context mechanisms for voting. And with for voting, some specific Arizona statutory context might be helpful. Arizona provides different types of mechanisms to vote. They provide early voting. They provide in-person voting. They provide accessible voting. They provide special election boards where folks who can't leave their homes are visited by two election officials and an affidavit is filled out. That context is really helpful in understanding. So, does Arizona use some of the machines where there isn't actually a paper ballot and you just sort of type on a screen and pick? And maybe there's an internal paper record, but there's never an actual ballot that you're filling out. That is an option for accessible voters. For example, if they are blind, you can listen to the vote and fill it out, or somebody might help help you fill out your ballot. There's also a touchscreen voting for those who qualify. And those ballots then print out what's called a skinny ballot. And that skinny ballot, my understanding is, is just, for lack of better terms, the answers of their vote, and that's fed into the voter tabulation machine. Providing them access to the machine would be providing them a mechanism for voting? Yes, Your Honor. The machine would act in the place of the ballot in that sense. So, Counsel, you said that context, we should look at the context right now. You've gone through the context. How does that change the plain meaning of the word mechanisms of voting? I still don't, on its plain language, understand the scope of what that covers. Yes, Your Honor. Mechanisms, we looked at the dictionary definition, and that means the fundamental processes. And the processes for voting and registration are fundamentally different, separate and distinct. You can vote without being registered, albeit that voting will be provisional and it won't count, and you can register without voting. These processes are separate, they have different consequences, and they'll carry different, they can be done separately. And with that, Your Honor, I'd like to reserve the remainder of my time for rebuttal. Wait, let me, I'll give you the extra time back, but I want to play out your answer a little bit more because the dictionary definition, I'm not sure, helps you. It defines the process as a series of actions or operations conducting, conducing to an end. So, how do you draw the line between voter registration efforts versus essentially the ballot or the machine that takes the place of a ballot? Yes, Your Honor, I think, and this is one of the examples we provided in our opening brief, looking at what has to be repeated for the process is a helpful way to think about it. You have to show up to the ballot box, you fill out your ballot, and you submit it. And that's one way to think about how casting a ballot is a distinct process from start to end. And if you look at the other way, if you look at prerequisites, you certainly, we're not disputing that, you know, for your vote to be valid, you don't have to be registered to vote. But at the same time, if you send that to all prerequisites, if you send it to becoming a U.S. citizen, that would arguably extend it past, you know, to a naturalization ceremony. And in that sense, that would be an absurd reading. So, I think the natural break there is the voting process for each individual election. All right. Thank you. Good morning, Your Honors, and may it please the Court. Josh Whitaker, representing Arizona Attorney General Kristen Mays. I plan to use seven minutes, and I'd like to reserve the remaining about two for a bottle if that's all right. So, I'm focusing on the standing and rightness of the challenges to the felony provision. And I'll start with first principles. Plaintiffs, as the party invoking a federal court's jurisdiction, had the burden of demonstrating that the jurisdiction exists. And that burden varies depending on the stage of litigation. Here, plaintiffs were seeking a preliminary injunction, so they needed to make a clear showing on each element of standing. That's this court's decision in Lopez in 2010. That includes a clear showing on the element of injury in fact, which, as we know from the United States Supreme Court, must be actual or imminent, not conjectural or hypothetical. And I mention these principles because I think that there is some implicit burden shifting going on in both the district court's opinion and in plaintiff's briefs on appeal. To get more specific about plaintiff's burden, we start with this court's en banc decision in Thomas in 2000. Thomas involved a pre-enforcement challenge under the First Amendment to a state law that had a criminal penalty. The court explained that standing or rightness, as they dovetail in this case, has both a constitutional and prudential component. And here we think plaintiffs fail both. The court in Thomas said the mere existence of a proscriptive statute is not enough. The court in Thomas said that a generalized threat of prosecution is not enough. There must be a genuine threat of imminent prosecution. Well, their whole theory is that this is so vague that it could be read to cover registration activities. And they certainly have made a showing that they engage in activities related to those sorts of registration activities. So, if they were right on the merits, how would they not have standing? Their conduct that they actually engage in would become unlawful. Because, Your Honor, that only speaks to one of the three Thomas factors. So, the other two factors are whether there has been a history of enforcement and whether the prosecuting authority has made a specific threat or warning to initiate proceedings. And here, not only is there no history and not only is there no specific... In that First Amendment context, they think a statute makes their conduct unlawful, but the AG and the county DA just sit there silently. They have to just sweat it out? They don't get to sue over that? So, this is not the AG sitting here silently. The Attorney General took the position from the beginning of this litigation. And remember, this litigation was enacted before the statute was even in effect. I mean, it's a pre-enforcement challenge. I know that's the fact, but the standard that you said is that they need to have a credible threat. And if you sat silently, you could still say there's no credible threat. And I just... I think in a First Amendment context, when your argument is that they're potentially criminalizing conduct I actually engage in, I don't see how they don't have standing to attack the constitutionality of that statute. So, Your Honor, let me give you an example, which I think is close to what you're saying and will explain how that example is not this case. If they had sued and the Attorney General, in its response, made no mention either way of how it interprets this provision, it was cagey about whether it would apply to the conduct they plan to do, their silence on the part of the Attorney General in litigation, then that would be a closer case. Because some panels of this court have said when there's a failure to disavow, you can count that toward plaintiffs in some cases. But here from the beginning, there's no controversy. They want to do certain things and the previous Attorney General has said, we don't interpret the statute to prohibit that. The new Attorney General has looked at the case and reached the same conclusion. Our position is the same on that. So, there's just no controversy. They want to do something. The only named prosecutorial authority has said, we don't interpret the law to criminalize what you want to do. Otherwise, it would be an advisory opinion. Otherwise, it would be an abstract. They can also establish standing if the organization shows diversion of resources. Is there any question that this record shows that? I think you have to, you can't have a diversion of resources based on a non-objective credible threat. So, that's an irreducible minimum. It may be that plaintiffs are going to divert resources. But I would direct this court, for example, to its Lopez where the court said, a subjective chill is not enough. There has to be some objective threat and here that's just absent. I'd like to reserve the remainder of my time if you don't mind. All right. Good afternoon, your honors. And may it please the court. My name is Aria Branch. I represent the plaintiffs in this case. This court should affirm the district court's decision to enjoin the felony and cancellation provisions. The district court used accepted methods of statutory interpretation and found that the felony provision was void for vagueness and that the cancellation provision was both preempted by and violated the NVRA. In doing so, it reached a result that is consistent with the Seventh Circuit's interpretation of the NVRA. I'd like to start off by addressing the jurisdictional questions, the standing issue that was just raised, and make clear that this court clarified in Valle del Sol, Inc. v. Whiting. This court clarified its holding in Thomas and specifically said, this court has never held that a specific threat is necessary to demonstrate standing, especially within the First Amendment context where plaintiff's injury is the chilling of their constitutionally protected speech. It's not that they have to wait for an investigation to begin or for a prosecution to be close at hand. There's nothing unduly speculative about believing that this attorney general or any future attorney general will enforce the law as written. While the attorney general has taken the position within this litigation that it will disavow enforcement with respect to voter registration, this court has also held that disavows solely within the holding in the Lopez case. That's clearly because the attorney general could change his mind. The Supreme Court held in United States v. Stevens that the court will not enforce an unconstitutional law or uphold an unconstitutional law merely because the government promises to use it responsibly. That's exactly what you have here. All we have in terms of disavows from the attorney general is what's written in their briefs. They've challenged the standing on the felony provision. But can I ask, what was the basis for the plaintiff's standing with respect to the cancellation provision? With respect to cancellation, the plaintiffs have both an associational and diversion of resources harm. One, first, that their members, the Alliance for Many of them are registered to vote in other states. Do you identify any voters who were dropped from the rolls and unable to vote at all by virtue of this statute? At this stage of litigation, that's not required. Of course, the statute was enjoined two days after its effective date. It was enjoined the Monday, the first business day upon which it became effective. Did you identify any members who had individual standing to challenge the cancellation provision who would be affected by it in a harmful way? We did not. But at this stage of litigation, that's not required. You're enjoining a state statute and you don't have to show standing. One of the three requirements of Hunt associational standing is that individual members themselves have standing. And you just said you didn't do that. Well, we absolutely had to prove standing, Your Honor. You're correct. But we also allege an organizational injury. And when you allege an organizational... A Havens Realty Theory. Excuse me? A Havens Realty Theory. Correct. That the organizations, Voto Latino, the Arizona Alliance for Retired Americans, would have to divert resources in order to inform their members that their registrations could be canceled solely because they're registered to vote in the other state. Under that theory, everyone has standing to criticize. Anyone can sue over any government action they don't like. Because if I don't like it, I have to tell my members. This eliminates Article 3 standing and read Havens Realty that far. Well, I don't think that's true, Your Honor. I mean, we submitted declarations from the leadership of these organizations who were, in light of the enactment of SB 1260, preparing to take real steps to have to divert resources that they would have otherwise used to help register voters to inform them how to cast ballots in order to tell them how to cancel their registrations. That's not something they had ever spent resources on previously because the cancellation provision simply was not in effect. I'd like to turn to the felony provision. And there, that the court used accepted methods of interpretation to evaluate whether the felony provision was void for vagueness. It correctly concluded that it was. The term mechanism for voting is vague. And I would submit to this court that the question before the district court was not which interpretation of mechanism for voting is more persuasive or more correct even. The standard is whether a person of ordinary intelligence could understand what mechanism for voting means in order to understand what conduct is prohibited by the felony provision. And this is a criminal provision that has criminal penalties, a felony, not a misdemeanor. And the dictionary definition, which is where courts typically go to determine what terms will mean to a lay person, mechanism is defined as the fundamental process for taking an action. And I would submit to the court that there is no more fundamental process associated with voting than voter registration. We all know that in order to cast a ballot and to have that ballot count, you have to be registered to vote in the county in which you submit that ballot. The defendants have submitted briefs both in the appellate court and below where they have changed the definition of mechanism for voting numerous times, all while simultaneously asserting that the phrase is clear. We shouldn't just be narrowly construed to mean as its language suggests mechanics for casting a ballot. And so it refers to the ballot or the mechanisms for casting a ballot. And that would eliminate registration and fit the text. Well, respectfully, Your Honor, I think that would require this court to rewrite the statute. And that is the legislature's job. The felony provision includes, it says that you can't provide a mechanism for voting to someone who is registered to vote in other state, including forwarding a ballot to such other person. In other words, the term mechanism for voting is more capacious than just a ballot. And the defendants admit that in their brief on appeal. It covers like giving them access to this touch screen or to the other types of different mechanisms that don't fit within the definition of a ballot. And if that's the case, then the legislature should have defined mechanism for voting as that. But that's not what's in the statute. But if you look at section 1016, all the list of things that are criminalized, it does seem to focus on the act of voting. It says you can't vote twice, you can't vote in two locations, you can't destroy the ballot box after you've voted. So shouldn't we construe it as something similar akin to active voting here? Well, I mean, I think that voter registration is inextricably connected to the act of voting. While there is a separate provision of the code that defines crimes associated with voter registration, it's clear that the felony provision encompasses more than that. So yes, it encompasses things associated with voting and actions associated with voting, but it also could encompass voter registration. There's just nothing on the face of the statute mechanism for voting that would exclude voter registration, that would exclude helping someone fill out a ballot or cast an early ballot. And the defendant's definition of mechanism for voting, they offer a new one in their appellate brief. It's an 11-line definition, and it is not constrained to just a machine or a ballot. It encompasses things like checking into a voting location, which is something the plaintiffs help voters do, and I would submit in our declarations in the district court, helps voters find their voting locations, and in doing so, encourage them to vote. And that activity is covered by the First Amendment. It would also fall within the defendant's definition of mechanism for voting. I think one of the arguments, if I understand their briefing correctly, is that mechanisms for voting is really cabined to the steps that's necessary for voting as to each election cycle. So voter registration drives or registration paperwork wouldn't be included in that, but is there anything in the statutory text that supports the argument that this is each election cycle versus just voting, period? There is not, Your Honor. The statute merely says, mechanism for voting, and so in order to get to the defendant's interpretation, you have to read words into the statute. You have to rewrite the statute to save it. Unfortunately, the legislature did not define mechanism for voting, and it's absolutely, I think, within the ordinary person might think that voter registration and, frankly, many other activities could be covered by mechanism for voting. I think we agree there must be some limit to what a mechanism for voting is. We just don't know what that limit is because the legislature didn't define it. And the district court did not abuse its discretion in concluding that it could include voter registration. Turning to the cancellation provision, the court interpreted the cancellation provision using common methods of statutory interpretation. The NVRA requires a carefully choreographed procedure to be followed before a voter's registration can be canceled. The problem with the cancellation provision is that it requires cancellation outside of that procedure. The cancellation provision requires cancellation solely upon confirmation with another county recorder. There's no requirement that a county recorder have direct communication with the voter, and that violates the NVRA. That's exactly what the Seventh Circuit held in the League of Women Voters and Common Cause cases. The federal statute is saying that if somebody moves and then registers in another county, unless and until they send the paperwork, the state is required to keep them twice on the same voter roll because they consolidate all this. That's correct, Your Honor. I mean, it is not our position that voters should remain registered to vote in multiple counties forever. But the point of the NVRA is to make sure that there has been direct contact between the canceling recorder and the voter to ensure that the person who registers in that new county is actually the same person whose registration is going to be canceled. And that's a really important point because there's lots of John Smiths who have the same birth date. And the NVRA says you have to make sure that there's not a list matching error, that a voter's registration is not going to be canceled in error because the county recorders merely confirmed information between each other as opposed to reaching out to the voter to confirm, and that word has meaning as the Seventh Circuit held, that that voter actually wants to cancel their registration. Is there anything in the record on that kind of, you know, confusion where people have been mistaken in the past? Well, I think the Seventh Circuit cases speak directly to that. And frankly, the NVRA itself, which the defendant's state in there... There's a difference between when you're going to a different state, you're going into totally different systems where they don't know each other's parameters or even laws. But when you have a consolidated state system and someone's in the system at one address and then they register at the other address and you just move them over, that seems to be a direct communication within a single system. Well, I think it's important to note first, in response to your question, this is not a direct response, but I will absolutely respond to it, that the district court held that there's nothing in the text of the cancellation provision that limits it to moves and new registrations within the state of Arizona. And that is an important point, because that was the Secretary of State, who was the chief election officer. The Secretary of State in the district court took that same position, that the cancellation provision applies both to registrations within, new registrations within Arizona and outside of Arizona. And that way, this case is directly on point with the Seventh Circuit cases. But what I would say is that the Seventh Circuit reasoning equally applies here because the NVRA still applies when voters move within the state of Arizona. If I am John Smith and I register in new County A, I was previously registered in old County B, it's not enough for County A to correspond with County B and cancel my registration. But if the state has a consolidated system and they change the address and move someone over to the other district, how is that a situation in which the name of a registrant is removed from the official list? It's not removed. It stays there. It just changed the address on the registration to the different one. Well, I would point your honor to 52 U.S.C. 20-507-J, which talks about the registrar's jurisdiction. And the NVRA specifically says that a state shall not remove the name of a registrant on the ground that the registrant has changed residence unless the registrant has confirmed in writing that they have changed residence to a place outside of the registrar's jurisdiction. The defendants concede everyone knows that voter registration in Arizona takes place on the county level. It's not on the state level. But that provision still has the same language that the proceeding at a state shall not remove the name of a registrant from the official list of eligible voters in elections per federal office on the ground the registrant has changed address unless. But they never removed them from the list. They just changed the address in the record. I have two responses to that, your honor. The first is that we don't know if the voter actually gets removed from the rolls because there hasn't been that double check. The NVRA, basically what's happening is when the voter registers in a new county and they were previously registered in the old county, if certain information matches, then the county recorders assume that the new person who filed the new registration in county B is the same person who filed the new registration but was the same person who was previously registered in county B. And the NVRA doesn't allow for that assumption to take place. The Seventh Circuit recognizes an inference is not enough. The second response I would have to that is the language in the NVRA. If you just read the text of it, it says that the registrant has to confirm their change of address. The cancellation provision doesn't allow and doesn't require any confirmation to take place with the registrant. When the voter registers in new county A, they confirm that information with the county recorder. But that just collapses the word confirmation with knowledge, right? The old county B now knows that the voter has an indication. It has knowledge that the voter has registered in a new county, but it has not confirmed that information yet. But why can't we read the NVRA as a language? The registrant confirms in writing that the registrant has changed residence to a place outside the registrar's jurisdiction. The word confirmed to mean just you're confirming the fact that you moved and you registered to a new place. That could include registering in a new county. By doing that, you're confirming that you've moved and you want to vote in a new place. I guess to use a rough analogy, when you buy a car, you sign a contract with the dealer and the dealer then sends the DMV a registration form. That registration form can confirm the fact that you bought a car. I'm not sure the word in writing just means the new registration form because you've confirmed in writing there. I don't think it does. I think there's a reason why the Seventh Circuit held that confirmed does actually require that two-step process. The reason is because the NVRA requires a belt and suspenders approach. It takes the guesswork out of determining whether the new voter is the clear. For example, if a state learns from the Postal Service that a voter has moved, if a voter submits a change of address notification to the Postal Service, that information is transmitted to the county recorder. The NVRA still requires the county to send notice to the voter to confirm that they have actually changed their address. They have to send a notice. If the voter doesn't respond, the county has to wait two federal election cycles, which is equivalent to four years, before it can cancel that voter's registration. Similarly, states can't remove voters pursuant to a systematic program to maintain their voter rolls within 90 days of an election. That means that states can understand that they have ineligible voters on their rolls, but they can't remove them within 90 days of an election because the NVRA requires a belt and suspenders approach. The reason is to avoid mismatching errors, to avoid erroneous cancellations, and that's why the Seventh Circuit actually read real meaning into the word confirm. I mean, that is on the clear text of the cancellation provision, requires confirm, and the Seventh Circuit held that it stretches the meaning of confirm past its limits to ignore its key feature of corroboration and verification. Slightly odd thing about the D1A provision about confirming writing is that it doesn't have any, doesn't elaborate further of how you confirm that in writing, whereas, you know, you look at D1, excuse me, D2, when you remove it through notice, they provide exactly how to do it, you know, postage prepaid, a certain time limit, but the confirm in writing, it's just, there's nothing there of how a state can confirm in writing. If it was a two-step process, it seems like it's a big blank slate of how a state would go about doing that. I don't think there is a specific, you know, form that a voter has to fill out, so there isn't like a specific mechanism, to use a lack of a better term, but the point is that there has to be that confirmation. So, something has to happen, either the county has to send a notice, it has to have direct firsthand communication with the voter before it can cancel the registration, and that's just the plain text of the NVRA. With respect to A3, the text says that the name of a registrant can't be removed, except at the request of the registrant. In other words, there, the registrant actually has to request to be removed from the voter rolls. I would submit that the district court reviewed the plain text of these provisions, and the cancellation provision allows for confirmation outside of the scope of the NVRA. It doesn't require, as Your Honor pointed out earlier, any sequencing. There's no language about which registration should be canceled. It's absolutely possible that two county recorders could confirm a voter's registration with each other and both cancel that voter's registration. There's nothing in the statute that says first, second, outdated, postdated. There's no timing in the statute whatsoever. I think my time is up, so unless Your Honors have any further questions, I would request that this court affirm the district court's decision. All right. Thank you, Counsel. Thank you. Your Honors, three points on rebuttal. The first is with the felony provision. You don't need to rewrite or add words into the statute. The words for voting is all you need. The words for voting indicate votes. Those only happen every so often, usually twice a year. Tell me again your definition of mechanism for voting. Mechanisms for voting are the fundamental processes required to vote. Including what? What about checking in? Well, Your Honor, that's part of the process, but providing a mechanism to vote is the ballot and those associated documents. So the mechanism for voting excludes checking in? Yes. What about voter ID requirements? Your Honor, if the voter ID requirements provide that voter a mechanism to vote, provide them the access to voting in a sense that they are an out-of-state resident and fulfilled. Is that included in the definition of mechanism for voting? Because I thought one of the briefs said that your definition of mechanism for voting actually includes providing voter ID as well. So that seems a little different than the narrow definition that you're presenting in your argument today. Yes, Your Honor, and I think that definition was intended to be an example of what the process would be like and to emphasize that it would be a discrete process excluded from the prerequisites to vote. It's excluded from the definition of mechanism for voting or included? Because I thought the brief said it's included because it's necessary to the voting. Yes, Your Honor, and what I'm trying to say is that we use that definition as an example to show what the process is to vote. Meaning it's included, can be included. That's right. So if providing a voter ID can be included in the definition of mechanism for voting, what distinguishes that from registration papers to vote? There's a natural break between registration and voting. Voting happens on discrete dates. You have to have the ballot and you have to submit the ballot. There are certain mechanisms that might fall outside of that, but the registration process is completely separate and distinct. Again, you can fulfill the registration process without ever voting, and you can vote without fulfilling the registration process. What in the statutory language allows us to draw a distinction between the steps that you vote on that voting day versus anything that occurs prior to that? Yes, Your Honor, I mean, the statutory framework divides registration and voting procedures in different chapters of Title 16, and voting is a specific act, and I think just the words for voting is all you need to understand that. I'd also like to briefly touch on some of the points with the cancellation provision, emphasizing that the NVRA applies to states. The counter recorders are directed to collectively maintain the statewide voter database, and so that's an important fact to understand when looking at what the NVRA requires, unless there are any other questions. Any additional comments? All right. Well, thank you very much, both sides. They're very helpful arguments. The eighth matter is... Oh, I'm sorry. I take away your rubato time. I guess... Luckily, I haven't said submit it yet, so you'll get your two minutes. My apologies. Thank you, Your Honor. I know it's almost lunchtime, and hopefully that means I won't have many questions here, but... Okay, so Josh Whitaker again for Attorney General Kristen Mays. I'd like to try to make four points quickly in rebuttal. First, our view is that Thomas applies to the standing analysis. That was a First Amendment challenge. But to Judge Collins's point, if you're looking for a specific case about a vagueness challenge, that was Lopez. Lopez involved a First Amendment vagueness challenge, and it was in the same procedural context. You got to make a clear showing at the PI stage. And under Lopez, you got to look at the realistic threat of enforcement. And one of the things that the plaintiff said was that you can't just rely on a disavowal in litigation. I think that's reading too much into what Lopez actually said. Lopez was concerned with gamesmanship, where a party initially charges someone, say, but then recants, right, during litigation. Here, we've been consistent from the beginning. Both sides of the aisle, in terms of the Attorney General's administration, has said the conduct that you want to do is not criminalized, is not prohibited, in our view, by this provision. Third, plaintiffs said that the Ninth Circuit has clarified that no specific threat of enforcement is necessary. And we're not quibbling with that here. What we're saying is that when there's a pure pre-enforcement challenge, when there's been no opportunity for any court to interpret the statute, when the only prosecutorial authority named in the lawsuit has immediately and consistently disavowed an interpretation that would criminalize what plaintiffs are saying, then there is no standing. And it's a threshold issue. I know the court had a lot of questions on the merits of the vagueness issue, but this is a threshold issue that they had the burden on. The only final point is, Judge Collins, you mentioned a question about the standing related to the cancellation provision. This court in Carrico brought up a standing issue at oral argument and then decided, I believe, to invite supplemental briefing. If this court wishes to do that, we would be happy to oblige. All right. Thank you very much. Let me see if my colleagues have any additional questions on the standing issues. All right. Thank you, counsel, to both sides for your argument today. Now the matter is submitted. And we are in recess until tomorrow morning at 9.30. All rise. The session of the court stands adjourned, and we will resume tomorrow morning.
judges: NGUYEN, COLLINS, LEE